UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
CAPITOL AWNING COMPANY, INC.,                    **MEMORANDUM & ORDER**
                                                 07-CV-78 (KAM)(SMG)
                    Plaintiff,

          -against-

LOCAL 137 SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION,

                    Defendant.
-----------------------------------X
**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

          Capitol Awning Company, Inc. ("plaintiff" or

"Capitol") filed the instant action against Local 137, Sheet

Metal Workers International Association, AFL-CIO ("defendant" or

"Local 137") seeking damages under Section 303 of the Labor

Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 187.

(*See generally* Amended Complaint, Doc. Entry No. 3.)  Capitol

asserts that Local 137 is liable for conduct that violated

§ 8(b)(4)(i) and § 8(b)(4)(ii)(B) of the National Labor

Relations Act ("NLRA"), codified at 29 U.S.C. § 158(b)(4).  Both

parties have moved for summary judgment, pursuant to Rule 56 of

the Federal Rules of Civil Procedure, and their fully briefed

motions are now before the court.  (*See* Plaintiff's Motion for

Summary Judgment ("Pl. Mot."), Doc. Entry Nos. 32-34;

Defendant's Motion for Summary Judgment ("Def. Mot."), Doc.

Entry Nos. 35, 38, 40.)  For the reasons set forth below,

plaintiff's motion is denied and defendant's motion is granted in part and denied in part.

**BACKGROUND**

The following facts are undisputed unless otherwise noted and are taken from the evidence submitted by the parties in support of their motions.

**I.   Parties to this Action**

   **A.   Capitol**

Capitol is located in Queens, New York and manufactures and installs awnings on buildings in the tri-state area. (*See* June 13, 2007 Transcript of the Deposition of Philip Catalano ("Catalano Depo. Tr."), attached as Exhibit A to Plaintiff's Rule 56.1 Statement of Undisputed Facts, Doc. Entry No. 32-2 ("Pl. 56.1") at 8.) Philip Catalano ("Catalano") has a 35% ownership stake in Capitol and is the Vice President of Sales. (Catalano Depo. Tr. at 7-8.) Capitol has approximately thirty employees. (*Id*. at 9.) In 1995, both Local 137 and another union, the United Service Workers, IUJAT Local 955 ("Local 955") approached Capitol's employees, seeking to organize them. (*Id*. at 11-12.) Capitol's employees elected to organize under Local 955 and not under Local 137. (*Id*. at 11.) Shortly thereafter, Capitol signed a collective bargaining agreement (or C.B.A.) with Local 955, which remains in place at

present.  (*Id*. at 10-12; *see also* Local 955-Capitol C.B.A.,
attached as Exhibit C to the Declaration of Dante Dano, Jr.,
Doc. Entry No. 37 ("Dano Decl.").)  Local 955 is not affiliated
with the Sheet Metal Workers International Association, the New
York City and State Construction and Building Trades Councils,
or the AFL-CIO.

   **B.    Local 137**

        Defendant Local 137 is a labor organization that is an
unincorporated membership association.  (*See* Defendant's Rule
56.1 Statement of Undisputed Facts, Doc. Entry No. 35-2 ("Def.
56.1") at ¶ 2.)  Local 137 represents employees who manufacture
and install signs and awnings on buildings throughout the tri-
state area.  (*See* Dano Decl. ¶¶ 2-4.)  Local 137 has collective
bargaining agreements with The Greater New York Sign
Association, Mauceri Sign & Awning, and National Maintenance.
(*See* Local 137-The Greater New York Sign Association C.B.A.,
attached as Exhibit A to the Dano Decl.; Local 137-Mauceri Sign
& Awning C.B.A., attached as Exhibit B to the Dano Decl.)

        Paul Collins is the President of Local 137.  (*See*
Transcript of November 30, 2007 Deposition of Paul Collins
("Collins Depo. Tr."), attached as Exhibit K to Pl. 56.1 at 45.)
Dante Dano, Jr. is the New York Business Representative for
Local 137.  (*See* Transcript of June 20, 2007 Deposition of Dante

Dano, Jr. Deposition ("Dano Depo. Tr."), attached as Exhibit B
to Pl. 56.1 at 48.)  Collins and Dano also serve on committees
that oversee the investment of Local 137's pension fund.  (Dano
Depo. Tr. at 48-49; Collins Depo. Tr. at 40.)

### C.  Capitol – Local 137 Relationship

As set forth above, Capitol's employees elected to
organize with Local 955 and rejected organization under Local
137.  It is undisputed that on a prior occasion after Capitol
and Local 955 executed their C.B.A., Local 137 members have
claimed work on contracts awarded to Capitol.  (Catalano Depo.
Tr. at 12-13.)  For example, Collins approached one of Capitol's
customers with respect to sign and awning installations at Shea
Stadium.  (*Id.*)  There are not many details as to what
transpired between Capitol's customer and Collins; however, it
is undisputed that Collins claimed that the work belonged to
Local 137 and that because Capitol was not affiliated with Local
137, Capitol should not get the contract.  Notwithstanding
Collins' communications, the customer retained Capitol and
Capitol completed the project.  (*Id.*)

## II.  Chase Sign Project

### A.  Chase Initiates Renovations

In early 2006, J.P. Morgan Chase ("Chase") announced
its intent to "re-brand" its existing retail branch offices and

4

those it had recently acquired from other banks. (*See* Transcript of March 5, 2008 Deposition of Sal Ariganello ("Ariganello Depo. Tr."), attached as Exhibit J to Pl. 56.1 at 10-11.) As part of its rebranding effort, Chase planned to remove the existing awnings and signs from these retail branches and to install new signs and awnings that would display a new Chase logo (the "Chase Sign Project"). (*Id*. at 10-13.) The Chase Sign Project involved approximately 3500 retail branch offices nationwide, 800 of which were located in the tri-state area. (*Id*. at 12-13.) Sal Ariganello, a senior project manager at Chase, oversaw the Chase Sign Project. (*Id*. at 10, 13.) He was responsible for managing the contractors and insuring that the project was completed in a timely manner. (*Id*. at 13.)

Chase hired Monigle Associates ("Monigle"), a firm that specialized in "corporate branding" or "corporate identity design" to insure that the exterior signs and awnings displaying the new Chase logo had a uniform look nationwide. (*See* Transcript of November 20, 2007 Deposition of Kurt Monigle ("Monigle Depo. Tr."), attached as Exhibit C to the Declaration of James M. Murphy ("Murphy Decl."), Doc. Entry No. 39 at 7-10; Transcript of November 20, 2007 Deposition of Nelson Yarbrough ("Yarbrough Depo. Tr."), attached as Exhibit H to Pl. 56.1 at 11, 13-14.) To achieve uniformity, Monigle oversaw the manufacture and installation of signs and awnings by contractors

Chase retained.[1]  (Monigle Depo. Tr. at 8-10; Transcript of
October 30, 2007 Deposition of Robert Mehmet ("Mehmet Depo.
Tr."), attached as Exhibit D to Pl. 56.1 at 15.)  Nelson
Yarbrough, an Associate at Monigle, led Monigle's efforts.  In
particular, Yarbrough was responsible for creating sign and
awning design intent drawings (manufacturing blueprints for the
sign and awning systems to be manufactured by the contractors).
(Yarbrough Depo. Tr. at 11.)

    In spring 2006, Chase and Monigle held a "kickoff
meeting" in Philadelphia with the contractors retained to work
on the Chase Sign Project.  (Transcript of November 12, 2007
Deposition of Beth Powell ("Powell Depo. Tr."), attached as
Exhibit E to Pl. 56.1 at 43; Monigle Depo Tr. at 11; Yarbrough
Depo. Tr. at 44.)  At this time, Chase had hired as contractors
ImagePoint, Icon Identity, East Coast Sign Advertising ("East
Coast"), N.W. Sign, and Philadelphia Sign.  (Ariganello Depo.
Tr. at 34; Yarbrough Depo. Tr. at 14, 23; Transcript of
September 11, 2007 Deposition of Jonathan Bragoli ("Bragoli
Depo. Tr."), attached as Exhibit C to Pl. 56.1 at 22.)  Each of
these contractors received a contract to perform the sign and
awning work at designated locations based on the type of sign
and awning system required.  (Mehmet Depo. Tr. at 56.)  The

---

[1]     Capitol admits that Chase hired Monigle to oversee manufacture and
installation of signs; however, Capitol asserts that Chase retained Capitol
as the sole approved vendor of the awnings.  (Pl. Counter 56.1 ¶ 13.)

contractors also had the authority to hire subcontractors to manufacture and install signs and awnings.  (Yarbrough Depo. Tr. at 21.)

Chase and Monigle held the meeting to discuss their expectations.  (Powell Depo. Tr. at 43; Monigle Depo Tr. at 11; Yarbrough Depo Tr. at 44-45.)  Among other things, Chase indicated that it expected the contractors to use unionized labor.  (*See* Powell Depo. Tr. at 43.)  Chase's "goal was to cooperate with the unions and to avoid union issues through the program."  (Monigle Depo. Tr. at 11-12; *see also* Yarbrough Depo. Tr. at 45.)  The parties dispute whether Chase specified that it preferred that the contractors use Local 137 labor for all work or whether union labor, in general, was sufficient.  (*Compare* Def. 56.1 ¶ 16 and cited exhibits *with* Pl. Counter. 56.1 ¶ 16 and cited exhibits.)  The contractors' testimony is contradictory.  For example, Yarbrough and Kurt Monigle of Monigle do not recall Chase specifically directing the contractors to use Local 137 labor.  (Yarbrough Depo. Tr. at 45.)  Colleen Erickson of ImagePoint, however, did recall a Chase directive to use Local 137 contractors for installation, but not necessarily for manufacture.  (Transcript of November 7, 2007 Deposition of Colleen Erickson ("Erickson Depo. Tr."), attached as Exhibit I to Pl. 56.1 at 24, 95-96.)  Brad Nicely of ImagePoint testified that Chase preferred the use of union labor

to install signs and never understood that Chase preferred Local 137 to manufacture signs or awnings. (Transcript of November 6, 2007 Deposition of Bradley Nicely ("Nicely Depo. Tr.") attached as Exhibit F to Pl. 56.1 at 111-12, 122-23.) Ariganello of Chase did not recall any representatives from Chase directing exclusive use of Local 137. (Ariganello Depo. Tr. at 94.)

### B. Relevant Contractors and Subcontractors[2]

Chase retained ImagePoint, Philadelphia Signs, N.W. Signs, Icon Identity, and East Coast to manufacture and install the signs and awnings.

#### 1. ImagePoint

Chase awarded ImagePoint, a company head-quartered in Knoxville, Tennessee, a contract to manufacture and install signs and awnings for 100 locations in New Jersey and 70-100 locations in New York. (Nicely Depo. Tr. 12, 17-20; Transcript of November 7, 2007 Deposition of David McClurkin ("McClurkin Depo. Tr."), attached as Exhibit G to Pl. 56.1 at 8-9; Erickson Depo. Tr. at 14-15.) David McClurkin, ImagePoint's Vice President of Sales, negotiated the contract with Chase and had periodic contact with Chase during the Chase Sign Project.

---

[2]     The Chase Sign Project involved exterior renovations to thousands of retail branch offices. This list of contractors and subcontractors is not meant to be exclusive; rather, this section discusses only those contractors and subcontractors that the parties identified in their submissions as relevant to this action.

(McClurkin Depo. Tr. at 7-9.) ImagePoint had the facilities to manufacture signs in-house, but like the other contractors, had the option of hiring subcontractors for as much of its work as it desired. (Nicely Depo. Tr. at 15.) ImagePoint's Director of Installation Services, Bradley Nicely, was responsible for hiring subcontractors and overseeing their work. (*Id*. at 12-14.) ImagePoint's National Account Manager, Colleen Erickson, served as ImagePoint's lead contact with Chase during the Chase Sign Project. (Erickson Depo. Tr. at 11-12.) ImagePoint is not affiliated with Local 137. (*See id*. at 10; *see also* Dano Decl. ¶ 4, 10.)

### 2. Philadelphia Sign

Philadelphia Sign is a company that manufactures and installs signs nationwide. (Mehmet Depo. Tr. at 45-47.) Robert Mehmet is the President of Philadelphia Sign. (*Id*. at 45.) With respect to the Chase Sign Project, Philadelphia Signs received a contract for approximately 2000 branch offices, 135 of which were in New York. (*Id*. at 58.) Philadelphia Sign manufactured and installed signs at a portion of the sites. Additionally, Philadelphia Sign subcontracted a portion of its sign installation to National Maintenance and a portion of its sign manufacturing to Going Sign. (*Id*. at 60-61.)

Philadelphia Sign's relationship with Chase began in the 1980s, when Philadelphia Sign first began working for Chase. Philadelphia Sign is not affiliated with Local 137; however, like Capitol, it has had issues with Local 137 in the past. (*See Id.* at 24-25, 31-36.) For example, in 2006, Philadelphia Sign had a contract to install signs for Lukoil in New Jersey and employed non-Local 137 painters to paint the signs. Local 137 complained and positioned a large inflatable rat outside the worksite. Philadelphia Sign dismissed the non-Local 137 painters and hired Local 137 painters to finish the job. (*Id.* at 31-36.)

Based on this history, when Philadelphia Sign has a project in New York, Mehmet contacts Bragoli of National Maintenance to discuss the project. (*Id.* at 23-27.) Mehmet either subcontracts work to National Maintenance, a New York based Local 137 contractor, or seeks Bragoli's guidance as to other reputable Local 137 contractors. (*Id.* at 23, 66.) Mehmet undertakes these precautions to avoid problems with Local 137. (*Id.*) Over time, a staffing practice developed between Philadelphia Sign and Local 137. When Philadelphia Sign has a project in the New York area, it sends no more than one of its sign and awning installers for each Local 137 employee hired to work at that Philadelphia Sign worksite. (*Id.* at 41, 102.)

### 3. N.W. Sign

N.W. Sign is a company that manufactures signs. (Powell Depo. Tr. at 25.) Beth Powell is N.W. Sign's Director of Project Management. (*Id.* at 9.) Chase awarded N.W. Sign a contract for approximately 150 retail branch offices located within New York City. (*Id.* at 13, 16) N.W. Sign manufactured signs for the Chase Sign Project. Additionally, N.W. Sign subcontracted a portion of its sign manufacture and installation to National Maintenance and to Capitol. (*Id.* at 26, 29.) N.W. Sign subcontracted the manufacture and installation of awnings to Capitol. (*Id.* at 29.)

### 4. Icon

Chase retained Icon Identity to manufacture and install signs and awnings for the Chase Sign Project. (Ariganello Depo. Tr. at 34-35.) This company's involvement is of minimal relevance to the instant action and will be discussed below, when necessary.

### 5. East Coast

Chase retained East Coast to manufacture and install signs and awnings for the Chase Sign Project. (Ariganello Depo. Tr. at 34-35.) This company's involvement is of minimal relevance to the instant action and will be discussed below, when necessary.

### 6. Subcontractor - National Maintenance

Philadelphia Sign subcontracted a portion of its sign installation to National Maintenance. (Mehmet Depo. Tr. at 60.) National Maintenance is a sign installation and maintenance company that does not manufacture signs or awnings. (Bragoli Depo. Tr. at 11.) Jonathan Bragoli is the President of National Maintenance. (*Id*. at 9-10.) National Maintenance is a member of the Greater Sign Association, which negotiates with Local 137 on behalf of National Maintenance. (*Id*. at 14-16.) National Maintenance, through the Greater Sign Association, has a collective bargaining agreement with Local 137 for sign installation and maintenance.[3] (*Id*. at 16.) Occasionally, a customer will ask National Maintenance to manufacture and install signs and awnings. When National Maintenance receives such a request, it hires a subcontractor to manufacture the signs and awnings and seeks permission from Local 137 to hire the subcontractor. (*Id*. at 19, 28.)

### 7. Subcontractor - Capitol

After the kickoff meeting in early 2006, several contractors solicited estimates from Capitol for the Chase Sign Project. (Catalano Depo. Tr. at 16-17, 21.) On May 5, 2006,

---

[3]    This agreement excludes electric work. (Bragoli Depo. Tr. at 16.) National Maintenance's electricians are represented by a different union and electrical work is not in dispute in this action.

East Coast contacted Capitol and within one week East Coast sent purchase orders to Capitol to begin work for four retail branch offices. (*Id.* at 17, 20.) Shortly thereafter, National Maintenance and N.W. Sign requested estimates from Capitol. These two vendors submitted requests for estimates for the same ten to fifteen retail branches. (*Id.* at 21.) Capitol began working for both contractors, submitting its invoices for both to National Maintenance. (Bragoli Depo. Tr. at 24-25, 46, 61.)

In June 2006, a design team from Chase visited sites where Capitol had installed awnings. (Catalano Depo. Tr. at 27-29.) Catalano suggested changes that could be made to the awnings to improve their overall look, in particular, by using a different process for applying graphics to the awning fabric. (*Id.* at 29-30.) Catalano prepared a sample awning that incorporated his suggestions and delivered it to Steve Shaw of East Coast. (*Id.* at 29-31.) Subsequently, East Coast informed Catalano that Chase liked his sample, and requested that Catalano submit his sample to Monigle as Monigle was the only firm that could authorize design modifications. (*Id.* at 31, 38-39.) Catalano contacted Yarbrough of Monigle to discuss Capitol's sample. (*Id.* at 39-40.)

On August 30, 2006, Yarbrough sent an email to all of the contractors on the Chase Sign Project. (*See* Yarbrough

August 30, 2006 4:37 P.M. email, attached as exhibit I to the
Murphy Decl.) Yarbrough indicated that he recently learned that
Chase had approved a "decoration system for awnings" and
described its specifications. (*Id.*) He further indicated that:

> This has been worked out by Capitol Awning.
> Please contact them for pricing. The
> contact there is: Phil Catalano (800-241-
> 3539). Please use this process for the
> pricing you are doing for the bank on the
> awnings.

(*Id.*) Representatives from Philadelphia Sign, N.W. Sign,
ImagePoint, East Coast, and Icon received this email. (*Id.*;
Yarbrough Depo. Tr. at 35)

The meaning of this email is disputed.[4] It was
Catalano's understanding that Capitol's awning design would be
installed at the majority of the retail branch offices.
(Catalano Depo. Tr. at 40-41, 45-47, 54.) Some of the
recipients of this email had a similar understanding. They
understood it to mean that Monigle had selected Capitol as the
exclusive or required awning manufacturer for the Chase Sign
Project and that they must use Capitol's awning. (Powell Depo.

---

[4]    It is surprising that the parties did not specifically question
Yarbrough, the drafter of this email, about his understanding of Chase's
intent regarding Capitol's awnings. Yarbrough indicated that at the time of
this email, Monigle had approved of Capitol's technique for applying graphics
to the awning fabric. (Yarbrough Depo. Tr. at 85.) Neither party questioned
him as to whether Capitol, the company that had developed this technique,
would be the exclusive awning manufacturer. After problems between Capitol
and Local 137 surfaced, Yarbrough immediately began searching for a second
awning manufacturer. Thus, prior to problems with Local 137, it does not
appear that Monigle had hired any other awning manufacturers to produce
awnings using Capitol's technique.

Tr. at 30-32; Erickson Depo. Tr. at 41-45; McClurkin Depo. Tr. at 12-13; Nicely Depo. Tr. at 67.)  Philadelphia Sign understood that they should contact Capitol regarding pricing, but were uncertain as to whether they were required to use Capitol to the exclusion of all other awning manufacturers.  (Mehmet Depo. Tr. at 75, 83.)  Ariganello of Chase understood that Capitol's process for fusing the graphics to the awning fabric had been approved by Monigle.  (Ariganello Depo. Tr. at 67.)  Regardless of the meaning of the email, it is undisputed that at the time it was sent there were no awning vendors other than Capitol, whose process and pricing had been approved and distributed to the contractors.  (Catalano Depo. Tr. at 45; Yarbrough Depo. Tr. at 37, 42-43.)

After Yarbrough sent this email, several contractors and subcontractors contacted Capitol.  (Catalano Depo. Tr. at 44.)  In late August 2006, Icon Identity contacted Capitol for samples of its awnings.  Capitol also began manufacturing awnings for a handful of sites awarded to National Maintenance, as National Maintenance had no manufacturing capabilities. (Bragoli Depo. Tr. at 61.)

Mehmet of Philadelphia Sign contacted Catalano in early September 2006 to discuss the Chase Sign Project.  (Mehmet Depo. Tr. at 85-86.)  Catalano informed Mehmet that Monigle had

approved of Capitol's awning sample and that he would send

Mehmet pricing information. (*Id.* at 86.)  It appears that

Philadelphia Sign intended to use Capitol on a large portion of

its sites. (*Id.* at 70-71.)  Mehmet asked Catalano if Capitol

was affiliated with Local 137.[5]  (*Id.* at 88.)  According to

Mehmet, Catalano stated that he was affiliated with Local 137.

(*Id.*)

ImagePoint contacted Catalano during the last week of

August 2006 to discuss the Chase Sign Project.  Shortly

thereafter, representatives from ImagePoint, including Erickson,

visited Capitol to inspect its facilities. (Catalano Depo. Tr.

at 58; Erickson Depo. Tr. at 49.)  Erickson was impressed and

confident that Capitol could manufacture the volume of awnings

needed. (Erickson Depo. Tr. at 49-51.)

Capitol had not previously worked with ImagePoint.

(Nicely Depo. Tr. at 66-67.)  Ordinarily, prior to visiting a

manufacturer in the New York area for the first time, Erickson

would inquire as to whether they were affiliated with Local 137

because she did not want to waste time inspecting facilities of

companies not affiliated with Local 137. (Erickson Depo. Tr. at

96-98.)  She did not ask Catalano about Capitol's affiliation

---

[5]      Mehmet stated that his three considerations were price, union
affiliation, and quality; however, Mehmet indicated that, had he not used
Capitol, he intended to use Awning Innovations, which he knew was not a Local
137 awning manufacturer. (Mehmet Depo. Tr. at 89-90.)

prior to this visit as she understood Capitol to be the "preferred" manufacturer of the awnings, and assumed that either Chase or Monigle had vetted Capitol with respect to its union affiliation. (*Id.*) During this visit, Erickson asked Catalano about Capitol's union affiliation. Catalano informed her that Capitol was affiliated with Local 955, not Local 137. (Catalano Depo. Tr. at 58-59; Erickson Depo. Tr. at 49-54.)

After visiting Capitol, Erickson informed Nicely of Capitol's affiliation as she was concerned as to whether Capitol's union affiliation would violate an earlier agreement that ImagePoint had reached with Local 137 in August 2006.[6] (Erickson Depo. Tr. at 55, 98.) Nicely conducted some online research and concluded that Local 955 was affiliated with United Service Workers and that Capitol's union affiliation would not

---

[6] Dano and Nicely first spoke in July or August 2006, as Nicely had learned of problems between ImagePoint and Local 137 related to ImagePoint's use of non-Local 137 awning installation contractors in New Jersey that did not employ Local 137 labor. (Dano Depo. Tr. at 103-04, 122-23; Nicely Depo. Tr. at 32-38.) Local 137 threatened to "shut down" the ImagePoint worksites, picket them, and place an inflatable rat near them. Nicely and Dano reached an agreement whereby ImagePoint agreed to use Local 137 labor for certain work and ImagePoint was free to use non-Local 137 labor for other work. (Nicely Depo. Tr. at 33-38.) On August 3, 2006, Nicely emailed Dano a summary of their agreement to memorialize it. (*Id.*)

Local 137 did not have a collective bargaining agreement with ImagePoint. According to Dano, it is likely that Local 137 did not seek to organize ImagePoint's employees because ImagePoint's factories are located in the southwest, and Local 137 operates primarily in the tri-state area. (Dano Depo. Tr. at 112.) Nonetheless, ImagePoint did work on occasion in the tri-state area, as it did on the Chase Sign Project, and ImagePoint worked out agreements such as this one with Local 137 to avoid any problems at worksites. (Dano Depo. Tr. at 112.)

be problematic.  (Nicely Depo. Tr. at 72-73; Nicely Affidavit, Ex. O to Decl. of James Murphy in Support of Def. Mot.) ImagePoint proceeded with Capitol.  (Nicely Depo. Tr. at 73.)

### C.    Interactions with Local 137

At some point in September 2006, Nicely heard that ImagePoint's use of Capitol might cause problems with Local 137. (Nicely Depo. Tr. at 76-78.)  Nicely heard from ImagePoint project managers and subcontractors that Local 137 was going to "shut us down" if Capitol did the awning work. (*Id.* at 18, 81, 112-13.)  Neither Nicely nor Erickson contacted the project managers or subcontractors to clarify whether Local 137 had threatened to shut down ImagePoint's projects or whether the subcontractors and project managers on their own had determined that using Capitol would be problematic.  (*Id.* at 114-15.)

On or around September 25, 2006, Nicely of ImagePoint contacted Dano of Local 137 to discuss Capitol.[7]  (*Id.* at 83-84; Dano Depo. Tr. at 117-19.)  Nicely explained to Dano that Capitol was a union company.  (Dano Depo. Tr. at 118.)  Dano informed Nicely that Local 137 did not consider Capitol to be a union company as Capitol had no collective bargaining agreement

---

[7]    Prior to this conversation, Dano had contacted Paul Collins of Local 137 to find out the total amount of pension funds Local 137 had invested in Chase stock.  (Dano Depo. Tr. at 115-17; Collins Depo. Tr. at 38-39.)  Dano indicated that he wanted this information for his conversation with Nicely because he intended to ask Nicely to remind Chase of Local 137's investment in Chase.  (Dano Depo. Tr. at 115-19.)

with Local 137, the AFL-CIO, or any other New York City building trades associations.[8] (*Id.*) Dano informed Nicely that Chase consistently used Local 137 on its projects and that Dano did not think that Chase would want to use a company that was not affiliated with Local 137. (Dano Depo. Tr. at 118-19.) Nicely did not recall a discussion of the history of Chase's relationship with Local 137; rather, he recalled Dano stating, "as a matter of fact," that Capitol would not be working on the Chase Sign Project, (Nicely Depo. Tr. at 121), however, Dano had no authority to determine which contractors Chase hired and fired (*see id.* at 86-87.).

Both Nicely and Dano testified that Dano did not make any explicit threats to picket, to refuse to install awnings made by Capitol, to "shut down" ImagePoint or to engage in any particular dilatory tactics. (Nicely Dep. Tr. at 92, 119-24.) Nonetheless, Nicely interpreted Dano's "matter of fact" statement to mean that Local 137 would not work with Capitol or install awnings manufactured by Capitol. Nicely attempted to persuade Dano to take a more conciliatory approach.[9] (*Id.* at 84, 92, 124.) Nicely told Dano that Chase, not ImagePoint, had selected Capitol and that Capitol was the preferred awning

---

[8] Dano conceded that, at the time of this conversation he was aware of Capitol's affiliation with Local 955; however, Dano did not consider Local 955 to be a "legitimate union." (Dano Depo. Tr. at 120.)

[9] Dano did not recall this portion of their conversation. (Dano Depo. Tr. at 130, 135.)

manufacturer for the Chase Sign Project.[10] (*Id.* at 84.) Nicely
further indicated that ImagePoint had no interest in whether
Capitol manufactured the awnings or not; rather, ImagePoint
hired Capitol because Chase, ImagePoint's customer, wanted
Capitol. (*Id.* at 89-90, 122.) Nonetheless, Nicely understood
that Local 137 would not work with Capitol on the Chase Sign
Project. (*Id.* at 92.)

Dano testified that he did not intend to imply that
Local 137 would not allow Capitol to work on the Chase Sign
Project. (Dano Depo. Tr. at 138.) Nor did he threaten to get
Capitol taken off of the project. He stated that when he said
that there was no way that Capitol would remain on the project,
he was making a "prediction" that, based on Chase's historic
reliance on Local 137 contractors, Chase would not keep Capitol
on the project. (*Id.* at 147.) Dano further indicated that had
Capitol remained on the project, Local 137 would not have
refused to install their awnings; however, Dano conceded that he
never informed Nicely that Local 137 would install awnings made
by Capitol. (*Id.* at 149.)

Nicely told Dano that he would contact Chase to
discuss Capitol's affiliation. (*Id.* at 119.) Dano instructed
Nicely to remind Chase that Local 137 had eight to ten million

---

[10]     According to Ariganello, Monigle selected Capitol's process for
manufacturing the awnings, not Chase. (Ariganello Depo. Tr. at 105.)

dollars invested in Chase stock. (*Id*. at 119; Nicely Depo. Tr. at 87.) According to Dano, he did not threaten to pull Local 137's pension funds out of Chase's stock. (Dano Depo. Tr. at 127.) Dano did admit, however, that Nicely might have interpreted his statement in that manner. (*Id*. at 142.) According to Nicely, it was clear that Local 137 did not want Capitol on the Chase Sign Project. (Nicely Depo. Tr. at 87, 90.) Nicely and Dano were unable to reach a resolution. (*Id*. at 89, 124, 128.) After this conversation, Nicely contacted Erickson and suggested that she discuss this issue with Monigle.

Around this same time, and without knowledge of Nicely's conversation with Dano, Yarbrough of Monigle had contacted Mehmet of Philadelphia Sign to inquire as to whether Capitol was a Local 137 contractor. (Mehmet Depo. Tr. at 106-08.) Mehmet reviewed a list of Local 137 contractors and informed Yarbrough that Capitol was not on the list, but that Catalano, Capitol's owner had told Mehmet that Capitol was a Local 137 contractor. (*Id*. at 113.) Mehmet and Yarbrough agreed that Mehmet would contact Bragoli of National Maintenance to discuss Capitol's union affiliation. (*Id*. at 115.) When they spoke, Bragoli told Mehmet that Capitol was not a Local 137 contractor. (*Id*. at 116.)

**D.    Chase and Monigle Address Concerns Regarding Capitol**

On September 28, 2006, a conference call occurred among Mehmet of Philadelphia Sign, Ariganello of Chase, Bragoli of National Maintenance, Yarbrough of Monigle, and other Chase representatives.  (*Id*. at 122-23; Bragoli Depo. Tr. at 55; Yarbrough Depo. Tr. at 74-75; Ariganello Depo. Tr. at 57, 59-60.)  The parties discussed Capitol's affiliations with labor organizations.  Bragoli reiterated that Capitol was not a Local 137 contractor.  (Bragoli Depo. Tr. at 64, 72, 99; Mehmet Depo. Tr. at 127.) When asked about possible consequences for continued use of Capitol, Bragoli indicated that Local 137 might picket at worksites, and that if that occurred, his employees, who were represented by Local 137, would not be able to cross the picket lines to install signs and awnings.  (Bragoli Depo. Tr. at 74, 100; Mehmet Depo. Tr. at 127-29; Yarbrough Depo. Tr. at 82-85; Ariganello Depo. Tr. at 68-70.)  Bragoli explained that he was stating his belief of what could happen, and that he had no authority to speak on behalf of Local 137.  (Bragoli Depo. Tr. at 87; Mehmet Depo. Tr. at 135-36.)

On September 29, 2006, Yarbrough sent an email informing the contractors that they should stop using Capitol due to union-related problems.  (Yarbrough Depo. Tr. at 99-100.) Specifically, the email stated:

> It was brought to light yesterday that due
> to union issues, continued use of Capitol
> Awnings will adversely affect the rest of
> the program. As a result, you will need to
> find another manufacturer of awnings for the
> program . . . . You will need to work with
> Chase and Capitol Awnings to resolve any
> work that is started and needs to be
> stopped.

(Yarbrough Email dated Sept. 29, 2006 3:53 P.M., attached as

Exhibit M to the Murphy Decl.) The contractors finished their

existing projects with Capitol, and then redistributed new

projects to awning manufacturers affiliated with Local 137.

(Powell Depo. Tr. at 49-50.) Yarbrough began searching for

another contractor to fabricate the awnings.[11] (Yarbrough Depo.

Tr. at 100.) Yarbrough of Monigle and Ariganello of Chase

indicated that if there had not been any problems with Local

137, Capitol would have continued manufacturing the awnings and

would not have been removed from the Chase Sign Project.

(Yarbrough Dep. at 113; Ariganello Dep. at 74.)

## E. Work Continues After Capitol's Removal

Monigle then hired Awning Innovations to manufacture

the awnings. (Yarbrough Depo. Tr. at 98.) As a result of this

change in contractors, the overall cost of the awning work

increased. (Ariganello Depo. Tr. at 89-90.) According to

---

[11] Until now, Capitol was the only approved awning manufacturer.

Ariganello, Chase was not happy about the increased costs. (*Id.* at 91-92.)

On December 5, 2006, Local 137 engaged in what it asserts was area standards picketing outside of a Chase branch office located in Queens, New York, where Capitol was installing the last of its awnings. (Dano Depo. Tr. at 173; Powell Depo. Tr. at 54-55.) Dano indicated that he did not know the precise wages that Capitol paid its employees; however, he was certain that Capitol paid its employees less than the area standard and, thus, area standards picketing was warranted. (Dano Depo. Tr. at 177-79.)

## SUMMARY JUDGMENT STANDARD

A court may grant summary judgment only "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
moving party carries the burden of demonstrating the absence of
a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477
U.S. 317, 323 (1986).  In deciding a motion for summary
judgment, the court's function is not to resolve disputed issues
of fact, but only to determine whether there is a genuine issue
to be tried.  *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 249
(1986).  The court must construe the facts in the light most
favorable to the nonmoving party and all reasonable inferences
and ambiguities must be resolved against the moving party.
*Flanigan v. Gen. Elec. Co*., 242 F.3d 78, 83 (2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere
allegations or denials" but must instead "set forth specific
facts showing there is a genuine issue for trial."  Fed. R. Civ.
P. 56(e); *see also National Westminster Bank USA v. Ross*, 676 F.
Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory
allegations, and mere denials are not enough to raise genuine
issues of fact."); *Harlen Assocs. v. Incorporated Vill. of*

*Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture [are] insufficient to preclude the granting of the motion.").

Nor can the nonmoving party rest solely on the pleadings. *Celotex*, 477 U.S. at 324 (explaining that Rule 56(e) "requires the nonmoving party to go beyond the pleadings"); *Davis v. N.Y.*, 316 F.3d 93, 100 (2d Cir. 2002). Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Rule 56(e) and Local Civil Rule 56.1(d). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

**DISCUSSION**

**I.    Causes of Action Under the LMRA and NLRA**

Under Section 303 of the Labor Management Relations Act, codified at 29 U.S.C. § 187, it is unlawful for "any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4)." 29 U.S.C. § 187(a). Section 303 grants a private right of action for damages to anyone who is "injured in his business or property by reason [of] any violation of subsection (a) of this section . . . ." 29 U.S.C. § 187(b).

Section 8(b)(4) of the National Labor Relations Act, codified at 29 U.S.C. § 158(b)(4), prohibits specified conduct and activity by labor organizations as unfair labor practices. In particular:

> It shall be an unfair labor practice for a labor organization or its agents--
>
> (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
>
>                    * * *

> (B) forcing or requiring any person to cease
> using, selling, handling, transporting, or
> otherwise dealing in the products of any
> other producer, processor, or manufacturer,
> or to cease doing business with any other
> person, or forcing or requiring any other
> employer to recognize or bargain with a
> labor organization as the representative of
> his employees unless such labor organization
> has been certified as the representative of
> such employees under the provisions of
> section 159 of this title; Provided, That
> nothing contained in this clause (b) shall
> be construed to make unlawful, where not
> otherwise unlawful, any primary strike or
> primary picketing . . .

29 U.S.C. § 158(b)(4).

When a union targets an employer with whom it has a dispute, the union is said to have engaged in "primary activity." *See C&D Restoration, Inc. v. Laborers Local 79*, 02-CV-9448 (CSH), 2004 WL 736915, at *3 (S.D.N.Y. Apr. 5, 2004). When a union targets an employer with whom it does not have a dispute (a "secondary" or "neutral employer"), the union is said to have engaged in "secondary activity." *See id.* Section 8(b)(4)(b) of the National Labor Relations Act is "often described as a 'secondary boycott' section of the Act," although it does not proscribe "all secondary boycotts, but rather specific union conduct directed to specific objectives." *Carrier Air Conditioning, Co. v. NLRB*, 547 F.2d 1178, 1188 (2d Cir. 1976) (internal quotation and citation omitted). Specifically, the secondary boycott section "prohibits a union

from engaging in or inducing or encouraging strikes and picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer." *See NLRB v. Local 3 Int'l Brotherhood of Elec. Workers*, 730 F.2d 870, 875-76 (2d Cir. 1984) (citing *Carrier Air*, 547 F.2d at 1188-89). Unlawful secondary activity is recognized as "both effective and unlawful precisely because it disrupts the business relations of two parties" and constitutes "an interference by one party with the contractual relations of two others." *C&D Restoration,* 2004 WL 736915, at *3 (internal quotation and citations omitted).

## II.  Contentions of the Parties

Capitol moved for summary judgment on both claims, contending that it is entitled to damages as a matter of law. Local 137 moved for summary judgment against Capitol, contending that it is entitled to dismissal of both claims as a matter of law.  The court consolidated the motions and will evaluate the contentions of both parties in this memorandum and order.

### A.  Plaintiff's § 8(b)(4)(ii)(B) Claim

#### 1.  Legal Standard

A labor union engages in unfair labor practices with respect to a secondary employer in violation of § 8(b)(4)(ii)(B) when it (i) threatens, coerces or restrains a neutral party,

(ii) with the object of coercing that party to cease doing business with the plaintiff, and (iii) there is a causal connection between the violation and the harm plaintiff suffered. *See Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 348 (E.D.N.Y. 2009). A determination of whether § 8(b)(4)(ii)(B) has been violated "necessitates examination in depth of the facts . . . ." *Carrier Air*, 547 F.2d at 1181.

The first criterion requires a determination regarding "the *nature* of the union's conduct: whether the union or its agents . . . threatened . . . or restrained any person." *Id.* at 1189 (emphasis in original). In this regard, the Second Circuit acknowledges "Congress's intention to outlaw a fairly broad range of economic pressure tactics." *Id.* at 1191. However, "more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii) . . . ." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 578 (1988). Yet, courts have recognized that "in cases involving ambiguous statements the line between lawful persuasion and unlawful threats is not easily drawn." *See, e.g.*, *BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners*, 90 F.3d 1318, 1331 (8th Cir. 1996). Thus, while the statutory language prohibiting "threats, coercion, or restraints" has been termed "nonspecific" or even "vague," the Supreme Court has warned that these words "should be interpreted with caution and not given a

broad sweep." *DeBartolo*, 485 U.S. at 578 (internal quotations and citations omitted); *see also Carrier Air*, 547 F.2d at 1188 (noting the statute's use of "relatively precise terms" and the need to use "the words of the statute" as "the courts' principal referent in determining whether the section has been violated").

Thus, the touchstone for unlawful activity under Section 8(b)(4)(ii) is its coercive nature, whether the activity is secondary picketing, boycotting, or other acts. *See NLRB v. Fruit & Vegetable Packers Local 760*, 377 U.S. 58, 68 (1964) ("[T]he prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise."). However, Section 8(b)(4) does not prohibit a union from informing secondary employers of its intention to picket a primary employer or from picketing a primary employer at a site under the control of a secondary employer, so long as the picketing is primary in nature. *NLRB v. Ironworkers Local 433*, 850 F.2d 551, 554-55 (9th Cir. 1988).

To determine whether statements rise to the level of unlawful "threats, coercion, or restraints" under the secondary boycott provisions, courts consider the objective circumstances surrounding the statements rather than the subjective interpretation of the listener. *See, e.g.*, *BE & K Constr. Co.*, 90 F.3d at 1331 ("To determine whether particular statements

constitute a prohibited threat, the specific language and the surrounding facts and circumstances are examined, not the subjective interpretation of the listener."). Thus, where inconsistent or conflicting evidence exists about what message was intended, there may be a fact question to be decided by a jury. *Id.*

The second criterion involves a determination related to the "*purpose* of the Union's conduct: whether an object was to force [the neutral party] to cease handling the products of, or doing business with, [the plaintiff]." *Carrier Air*, 547 F.2d at 1189 (emphasis in original). Courts must determine whether "under all the surrounding circumstances, the Union's objective was preservation of work for [the boycotted or picketed employer's] employees . . . or whether the . . . [related activities] were tactically calculated to satisfy union objectives elsewhere." *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644 (1967). "[W]hether [a] union's conduct had an improper 'object' is a question of fact; moreover, that 'object' need not be the only one." *Bedding, Curtain & Drapery Workers Union v. NLRB*, 390 F.2d 495, 499 (2d Cir. 1968); *see also Iodice v. Calabrese*, 512 F.2d 383, 388 (2d Cir. 1975) ("When a labor organization takes action for the purpose of forcing an employer to cease doing business with another, it violates § 8(b)(4)(B) even if it has other purposes as well.").

With respect to the third criterion -- causation -- a plaintiff must demonstrate that the unlawful activity was a "substantial factor or material cause" of the plaintiff's injury. *See C&D Restoration*, 2004 WL 736915, at *4.

### 2. Application

#### a. First Criterion: Nature of Union's Conduct

With respect to the first criterion, Capitol contends that several of the statement's Dano made to Nicely of ImagePoint could be construed as unlawful threats made to a neutral, secondary employer. Additionally, Capitol asserts that unspecified members of Local 137 threatened various ImagePoint vendors, contractors, and employees. In particular, Capitol identifies the following improper threats:

- Dano told Nicely that "as a matter of fact" Capitol would not be working on the Chase program. (Nicely Depo. Tr. at 121.)

- Dano asked Nicely to remind Chase that Local 137's pension fund had eight to ten million dollars invested in Chase stock. (Nicely Depo. Tr. at 87; Dano Depo. Tr. at 119.)

- Nicely heard from Erickson that Local 137 contractors told ImagePoint employees that Local 137 would not work with Capitol. (Nicely Depo. Tr. at 78.)

- Nicely heard from ImagePoint project managers, subcontractors, and Erickson that Local 137 would shut down ImagePoint's operations. (*Id*. at 18, 78, 81, 112-13.)

As a preliminary matter, the conversations between Nicely and Erickson and others about what they heard from contractors and vendors are uncorroborated hearsay.  The record presented by the instant motions does not include evidence that either Erickson or Nicely spoke to the subcontractors about the alleged threats that Local 137 made to "shut down" ImagePoint.  Further, during his deposition, Nicely repeatedly disavowed any assertion that Dano had made a threat to "shut down" projects during their telephone conversation.  It is undisputed, however, that Dano (i) told Nicely that Capitol was not a union shop, despite Dano's knowledge that Capitol had an agreement with Local 955; (ii) informed Nicely that Capitol would not be working on the Chase program, and (iii) asked Nicely to remind Chase of Local 137's multi-million dollar investment in Chase stock.  These statements are the only statements at issue that can be construed as threats.

Nonetheless, it is important to note that these statements were made against the backdrop of historical conflict between ImagePoint and Local 137.  The evidence indicates that previously, Local 137 had picketed at an ImagePoint site in New Jersey, where ImagePoint employed non-union awning installers and further, that unspecified members of Local 137 had threatened to "shut down" ImagePoint for use of those non-Local 137 awning installers.  Nicely and Dano spoke in early August

2006 and resolved the dispute, which, among other things, involved ImagePoint conceding the manufacture of certain types of signs to Local 137. (Nicely Depo. Tr. at 55-63.) Capitol contends that Dano's statements, when considered in the context of ImagePoint's ongoing struggle with Local 137, are threats. Capitol also asserts that everyone involved in the project interpreted these statements as unspecified threats.

Local 137, on the other hand, contends that these statements cannot constitute a threat as they are isolated, ambiguous statements, which, as a matter of law, are insufficient to constitute a threat. Local 137 correctly notes that Dano did not make any explicit threats, but instead stated that Capitol would not remain on the project and told Nicely to remind Chase of Local 137's investment in Chase stock. It is undisputed that Dano did not mention picket lines, work delays, strikes or the positioning large inflatable rats near any of the worksites. Further, it was Nicely who contacted Dano, rather than Dano seeking out Nicely with a threat. Local 137 contends that Dano simply made a prediction as to what Chase would do (*i.e.*, remove Capitol from the project) if Chase learned that Capitol was not a Local 137 contractor, as Chase was loyal to Local 137.

The court agrees with Local 137, that most of the cases upon which Capitol relies are inapposite as they involve threats of a specific nature, such as threats to strike, to cause "trouble," and to picket, which are absent from the case at hand. *See, e.g.*, *NLRB v. Local 445*, 473 F.2d 249, 252 (2d Cir. 1973) (upholding a finding that union's threat to picket coupled with a statements that "not a wheel will turn" and "[n]othing will move" were unlawful threats under Section 8(b)(4)(ii)(B)); *NLRB v. Carpenters Local 180*, 462 F.2d 1321, 1323 (9th Cir. 1972) (upholding the finding of a threat where union stated it would "shut down" the secondary employer and stated that things could get "kind of rough"); *NLRB v. I.B.E.W. Local 453*, 432 F.2d 965, 966-69 (8th Cir. 1970) (upholding *NLRB*'s finding that union statement that it would picket unless secondary employer ceased doing business with primary employer constituted an unlawful threat); *NLRB v. Carpenters Dist. Council,* 383 F.2d 89, 94-95 (8th Cir. 1967) (upholding *NLRB*'s finding of an unlawful threat when picketing was threatened and initiated in order to force construction companies, against whom union had no dispute, to cease doing business with primary employer); *Wells v. NLRB*, 361 F.2d 737, 742 (6th Cir. 1966) (finding an unlawful threat when an ambiguous statement such as do not "act like a school kid" is accompanied by a threat to stop working); *NLRB v. Int'l Union of Operating Engineers*, 317

F.2d 638, 642 (8th Cir. 1963) (upholding a finding of an unlawful threat when union threatened picketing). Here, Dano made two allegedly threatening statements to Nicely, neither of which threatened specific action.

In this case there is, however, evidence in addition to these statements that could support a jury's finding of an unlawful threat. Contrary to Local 137's contentions, this case is not simply one of isolated predictions of unspecified problems or trouble. There is evidence that unspecified members of Local 137 may have conveyed threats to ImagePoint's vendors, subcontractors, and project managers that Local 137 would stop working at or "shut down" ImagePoint worksites if ImagePoint continued to work with Capitol. Although the plaintiff did not present deposition testimony from the vendors, subcontractors and project managers to whom Local 137 purportedly conveyed the message that ImagePoint projects would be shut down if Capitol was used, such witnesses may testify at trial. Additionally, Local 137 had threatened ImagePoint in the past, and had acted on those threats, by picketing at an ImagePoint worksite in New Jersey. Notably, this picketing occurred just one month prior to the conversation between Dano and Nicely regarding Capitol, and the prospect of Local 137 picketing was of great concern to ImagePoint's customers, Monigle and Chase. (Yarbrough Depo. Tr.

at 110-11.)  There is no dispute that Nicely and Dano were acutely aware of this history at the time they spoke.

These additional facts distinguish this case from those relied upon by Local 137 involving isolated, ambiguous statements deemed insufficient to support a claim of unlawful threats under § 8(b)(4)(ii)(B).  Indeed, ambiguous statements made in the context of picketing can be construed as an unlawful threat.  *See Pickens-Bond Constr. Co. v. Local 690*, 586 F.2d 1234, 1240-41 (8th Cir. 1978) ("The Union's statements, though couched in language having a surface neutrality, were calculated to reinforce and had the necessary effect of reinforcing, the naturally persuasive effects of the picket.").  On the record before the court, there is a material dispute as to whether Local 137 threatened ImagePoint and this issue is appropriate for resolution by a jury and not the court.

### b. Second Criterion: Purpose of Union's Conduct

Moreover, there is a genuine dispute of material fact with respect to the second criterion as well -- Local 137's objective.  Local 137 contends that it did not engage in the alleged threatening conduct with the object of forcing Chase and Monigle to terminate their relationship with Capitol.  According to Dano, his statement regarding Chase's use of Capitol was simply a prediction, and it was not his intent to imply that

Local 137 would not work with Capitol or that Chase must

terminate Capitol. (Dano Depo. Tr. at 138, 147.) Dano further

indicated that Local 137 would not have refused to install

awnings manufactured by Capitol. (*Id.* at 149.)

Yet, there is evidence to the contrary. Dano and

Collins of Local 137 both stated that they wanted Capitol

removed from the Chase Sign Project. Indeed, Collins testified

that he "was so happy that Capitol was off the job." (Collins

Dep. Tr. at 21; Ex. K to Plaintiffs 56.1.) Nicely testified

that despite his attempts to find a way to compromise with Dano

regarding Capitol's involvement in the Chase project, "[i]t was

very clear that [Local 137] did not want Capitol Awning as part

of the Chase program." (Nicely Depo. Tr. at 87, *see also id.* at

90.) There is evidence that this incident was not the first

time that members of Local 137 contacted contractors working

with Capitol to claim Capitol's work. (Catalano Depo. Tr. at

12-13.) Further, Catalano indicated that Yarbrough told him

that Local 137 did not care about who manufactured the awnings

as long as it was not Capitol. (*Id.* at 95-96.) Moreover, after

Monigle terminated Capitol, all of the contractors used a

different, out-of-state contractor to manufacture the fabric

portion of the awnings in the manner developed by Capitol.[12]

---

[12] Contractors employing Local 137 labor manufactured the structural supports for the awnings.

Notably, the new contractor was not affiliated with Local 137 and there is no evidence that Local 137 protested installation of its awnings. (Yarbrough Depo. Tr. at 98-99.)

The record reveals a genuine issue of material fact as to the purpose of that conduct under the second criterion.

### a. Third Criterion: Causation

Finally, there is a genuine dispute of material fact with respect to the third criterion -- causation. Local 137 contends that Chase and Monigle removed Capitol from the project based on Chase's previously expressed desire to avoid "union issues." Local 137 asserts that the dispute between Local 137 and Capitol pre-dated the Chase Sign Project, and that when it became known to the parties involved, Chase and Monigle terminated Capitol because the Local 137-Capitol dispute constituted a "union issue." (*See* Def. Opp. to Pl. Mot. at 12-26.) In support of its position, Local 137 asserts that neither Yarbrough nor Ariganello knew about the alleged threats that Local 137 made to Nicely and to ImagePoint's project managers and contractors and, therefore, Capitol's termination was unrelated to the alleged threats. (Ariganello Depo. Tr. at 105; Yarbrough Depo. Tr. at 100-01.) To reinforce its position, Local 137 points to the email Yarbrough sent to the contractors stating that Monigle terminated Capitol due to "union issues,"

with no mention of threats. (Yarbrough Email dated Sept. 29, 2006 3:53 P.M., attached as Exhibit M to the Murphy Decl.) Despite questioning by counsel for the parties, it is not clear whether Yarbrough's use of the phrase "union issues" refers to the alleged threats or the pre-existing dispute between Capitol and Local 137. Both parties failed to seek clarification on this issue.

Capitol contends that Monigle terminated Capitol for no reason other than pressure from Local 137. There is evidence to support this assertion. First, Monigle and Chase would not have removed Capitol from the project if the problem between Capitol and Local 137 had not developed. (Ariganello Depo. Tr. at 74; Yarbrough Depo. Tr. at 128.) Yarbrough stated that it was his understanding that continued use of Capitol "could cause a problem with union 137." (Yarbrough Depo. Tr. at 78.) Further, it is apparent from review of deposition testimony that Chase, Monigle, and all of the contractors had serious concerns about doing anything that would result in Local 137 engaging in work slowdowns at the Chase retail branch offices. (*Id*. at 55-58.) Second, Monigle removed plaintiff just four days after Dano and Nicely spoke. Finally, there is no evidence that, prior to the conversation between Dano and Nicely, other contractors, who were aware that Capitol was not affiliated with Local 137, intended to cease working with Capitol. Those

contractors continued working with Capitol until Yarbrough sent the email instructing them to terminate their relationships with Capitol. Resolution of the contradictory evidence on these issues is best left to a jury.

Accordingly, the genuine disputes of material facts set forth above preclude the grant of summary judgment in either party's favor on this claim.

### B. Plaintiff's § 8(b)(4)(i) Claim

A union violates § 8(b)(4)(i) when it induces or encourages the employees of a secondary employer to strike against or to refuse to handle goods for an employer to force the secondary employer to cease doing business with a primary employer. *See NLRB v. Servette, Inc.*, 377 U.S. 46, 50–54 (1964); *see also DeBartolo*, 485 U.S. at 578 ("We note first that inducing or encouraging [the] employees of [a] secondary employer to strike is proscribed by § 8(b)(4)(i).") (internal quotation marks omitted); *Allied Mech. Servs., Inc. v. Local 337*, 221 F.3d 1333, 2000 WL 924594, at *4 (6th Cir. 2000) ("[S]ubsection (i) is intended to encompass union pressure calculated to induce the employees of a secondary employer to withhold the services of their employment in order to force their employer to cease dealing with the primary employer."). "Employees must be induced; they must be induced to engage in a

strike or concerted refusal; and an object must be to force or require their employer or another person to cease doing business with a third person." *Allied Mech. Servs.*, 2000 WL 924594, at *4 (quoting *Local 1976, United Bhd. of Carpenters v. NLRB*, 357 U.S. 93, 98 (1958)).

As Local 137 correctly argues and, the cases discussed above explain, claims filed under § 8(b)(4)(i) are limited to instances in which a union targets the *employees* of a secondary employer and encourages those *employees* to strike or to refuse to perform their duties for that secondary employer. *See* Labor and Employment Law, Ch. 21, § 21.02[1] (2009) ((noting that "in simplest terms, [§ 8(b)(4)(i)] proscribes . . . inducing or encouraging employees to strike or withhold their services."); *see also Servette*, 377 U.S. at 52-53 (noting that § 8(b)(4)(i) condemns "union pressures calculated to induce the employees of a secondary employer to withhold their services in order to force their employer to cease dealing with the primary employer").

There is no evidence in the record whatsoever of Dano or any other Local 137 members contacting employees of Chase, Monigle, the contractors or subcontractors to encourage or induce those employees to strike or to refuse to perform their duties for their respective employers. It is for this reason,

perhaps, that Capitol failed to respond to this portion of Local 137's defense in either its reply on its motion or in its opposition to Local 137's motion. Thus, Capitol raised no triable issue of material fact as to its § 8(b)(4)(i) claim. Accordingly, the court grants summary judgment in Local 137's favor with respect to Capitol's § 8(b)(4)(i) claim. *See Carrier Air*, 547 F.2d at 1190-91 (dismissing plaintiff's § 8(b)(4)(i) claim as there was no evidence of encouragement to strike or to refuse performance ).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted in part and denied in part. Plaintiff's § 8(b)(4)(ii)(B) claim survives and plaintiff's § 8(b)(4)(i) is dismissed. The parties are ordered to appear for a telephone conference, to be initiated by plaintiff, at 4:00 p.m. on Thursday, April 22, 2010.

**SO ORDERED.**

Dated:     Brooklyn, New York
           March 18, 2010

                              _____/s/_____
                              **KIYO A. MATSUMOTO**
                              United States District Judge
                              Eastern District of New York